990 F.2d 1259
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
PALMER COMMUNICATIONS, INC., Plaintiff-counter-defendant-Appellee,
v.
COACHELLA CITY, Defendant
and
Edward Gorges; Grace Gorges, Defendants-counter-claimants-Appellants.
 No. 91-56446.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 1993.
Decided April 16, 1993.
 
 Before HALL, WIGGINS and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Edward and Grace Gorges ("the Gorgeses") appeal a jury verdict in favor of Palmer Communications, Inc. ("Palmer") on the Gorgeses' claim that Palmer breached a cable television franchise lease agreement. Jurisdiction is based on diversity. We affirm.
 
 FACTS
 
 3
 In 1960, the Gorgeses' cable television company obtained a non-exclusive, twenty-five year, cable television franchise from the City of Coachella, California ("the City"). The franchise was granted until December 17, 1985. The Gorgeses sold their company to Desert Cable TV, Inc. ("Desert Cable") in 1961. The Gorgeses also leased their franchise for the City to Desert Cable. Under the lease agreement, Desert Cable was obligated to pay monthly rental based upon a percentage of the monthly service charges that it collected. This dispute centers around the interpretation of the following terms in the lease agreement:
 
 
 4
 3. Term. This lease shall be for the life of the franchise herein leased, and all renewals thereof.
 
 
 5
 4. Renewal. Lessors [the Gorgeses] hereby agree to use their best efforts in obtaining renewals upon each termination date of said franchise, from time to time as the term of said franchise expires.
 
 
 6
 In 1964, all rights and obligations under the lease agreement were transferred from Desert Cable to Palmer.
 
 
 7
 As the termination date of the franchise approached, a dispute arose between Palmer and the Gorgeses regarding Palmer's obligation to make lease payments if Palmer was able to procure its own franchise from the City. On December 12, 1985, the City passed an ordinance that extended the Gorgeses' existing franchise on an interim basis until February 17, 1986. A week later, Palmer filed a complaint against the City, seeking an injunction and damages, and against the Gorgeses, seeking a declaration that Palmer no longer had to make rent payments. The Gorgeses counterclaimed for breach of contract and for violation of the covenant of good faith and fair dealing. On February 18, 1986, the City granted the franchise to Palmer. The City ordinance expressly took no position regarding whether the City had "renewed" the franchise under the terms of the lease agreement.
 
 
 8
 On November 14, 1986, the district court granted summary judgment for Palmer. This court reversed, holding that California law entitled the Gorgeses to present parol evidence regarding the meaning of the term "renewal" in the lease agreement. This court remanded "for trial on the meaning of 'renewal' intended by the parties."
 
 
 9
 At trial, the jury heard the following testimony regarding the lease negotiations between the Gorgeses and Desert Cable. Edward Gorges testified that he wanted the lease payments to continue "forever." He stated that Frank Thompson, the assistant to Desert Cable's owner, Paul Schmidt, told him that the Gorgeses' "great grandchildren and their great grandchildren," would receive money from the lease. Thompson, however, testified that the Gorgeses initially wanted the payments under the lease to go on forever, but that they finally agreed on a term of 24 years, the remaining life of the franchise. He specifically recalled rejecting the Gorgeses' request that the lease pay the Gorgeses' progeny forever. Finally, Frank Moore, who was Desert Cable's attorney in 1961, testified that he was not active in the negotiations; he merely transcribed the terms of the agreement. However, he testified that no one asked him to include the provision "and all renewals thereof" to the "Term" clause of the agreement. He included this provision on his own to protect Desert Cable in the event that it was unable to obtain its own franchise and needed Edward Gorges' political influence to renew the franchise. Schmidt was unable to testify because he was dead. The jury returned a verdict in favor of Palmer.
 
 DISCUSSION
 
 10
 On appeal, the Gorgeses make two arguments. First, they contend that the district court erred by excluding the testimony of Norman Smith and Maynard Miller, which would have related an apparent admission by Joseph Benes, a past general manager of Palmer's operations in the Coachella Valley. Second, they claim that the district court erred by admitting evidence of the amount paid to the Gorgeses under the lease agreement. We reject both arguments.
 
 
 11
 I. Any Error the District Court Made in Failing to Admit the Vicarious Admission of Benes Was More Probably than not Harmless.
 
 
 12
 The Gorgeses argue that the district court erred by concluding that the hearsay testimony of Smith and Miller did not qualify as an admission under Fed.R.Evid. 801(d)(2) because Benes did not have personal knowledge of the intent of the parties who executed the contract. We review rulings that admit or exclude evidence for an abuse of discretion. See Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988); Diede v. Burlington Northern R. Co., 772 F.2d 593, 594 (9th Cir.1985). However, such rulings will not be reversed if they are harmless. See Roberts, 870 F.2d at 1418; Diede, 772 F.2d at 594. "A trial court's error in excluding or admitting evidence in civil actions is harmless if the jury's verdict is 'more probably than not untainted by the error.' " Diede, 772 F.2d at 594 (citations omitted). We do not decide whether Rule 801(d)(2) requires a showing that Benes had personal knowledge because we conclude that the failure to admit Smith and Miller's testimony did not taint the jury's verdict.
 
 
 13
 The Gorgeses sought to introduce Smith's recollection of a telephone conversation he had with Benes in 1974 or 1975. At the time, Smith was the manager of a neighboring cable system. The essence of Smith's proffered testimony was that Benes, the general manager of Palmer's operations in the Coachella Valley, believed that the contract between Palmer and the Gorgeses would last in perpetuity. Smith would have testified:
 
 
 14
 Well, I do remember facetiously saying to Mr. Benes that I hadn't taken up business law in 30 years, I've been out of business school that long, and that I didn't think that a contract could be written in perpetuity. I remember using that phrase, and Mr. Benes stated "Well, it must be, because we have to keep on paying it."
 
 
 15
 Smith would have further testified that he did not know on what basis Benes made the statement. He did not know whether Benes' statement was his own opinion, based on a reading of the agreement, or whether Benes had been told by Palmer that the agreement would last forever.
 
 
 16
 We find that the exclusion of Smith's testimony was harmless. The sole issue for the jury was what the parties to the lease agreement meant by the phrase "and renewals thereof." The jury had before it the agreement and extrinsic evidence of the negotiations leading up to the agreement. They heard from three of the four negotiators of the agreement: Edward Gorges, Frank Thompson, and Frank Moore. These witnesses also testified regarding the intent of Paul Schmidt.
 
 
 17
 In light of this direct evidence of the contracting parties' intent, the absence of Smith's vague testimony regarding Benes' understanding of the agreement did not taint the verdict. Smith did not recall very clearly his fourteen to fifteen year old conversation with Benes. Moreover, Benes' alleged statement itself does not indicate Benes' basis for believing that the contract required perpetual payments. Further, Smith was unable to articulate such a basis for either Benes' or his own belief that the agreement would last forever. Neither Benes nor Smith were involved in the 1961 negotiations, nor had either discussed the agreement with one of the negotiators. In fact, the Gorgeses' offer of proof did not establish that either Benes or Smith had ever discussed the payments with Palmer's management. This lack of foundation for Benes' statement caused the district court to call Benes' statement a vicarious admission "of the lowest order." Because we find that the jury's verdict was more probably than not untainted by the exclusion of the testimony of Smith, we conclude that any error by the district court was harmless. See Roberts, 870 F.2d at 1418; Diede, 772 F.2d at 594.
 
 
 18
 The Gorgeses also proffered the testimony of Maynard Miller. Miller would have testified that while he worked at Palmer as a technician, he once asked Smith, who was then the general manager of Palmer, what a red line on a map meant. Smith responded that the red line area represented the area for which Palmer paid the Gorgeses under the lease agreement and that the lease payments were to be paid in perpetuity. Miller's testimony is contingent on Smith's understanding of the agreement, which was based on Benes' statement discussed above. Accordingly, because we find the exclusion of Smith's testimony harmless, we conclude that the exclusion of Miller's testimony was also harmless error. See id.
 
 
 19
 II. The District Court did not Err in Admitting Evidence of the Amount the Gorgeses Received Under the Franchise Lease Agreement.
 
 
 20
 The Gorgeses claim that the district court improperly admitted evidence that the Gorgeses received over $2,000,000 in lease payments over the term of the lease. The Gorgeses also contend that after admitting the evidence of the amount of the lease payments, the Gorgeses should have been allowed to introduce evidence that Palmer had stopped making payments and the Gorgeses had to sue to make Palmer resume payments. Again, our review of these evidentiary rulings is for an abuse of discretion. See Roberts, 870 F.2d at 1418; Diede, 772 F.2d at 594.
 
 
 21
 Palmer sought to introduce evidence of the large payments the Gorgeses received under the lease to show that it was unlikely that the parties intended the lease payments to continue after the life of the initial franchise. Palmer produced evidence that two other Coachella Valley cable television companies that had greater subscribership were sold, along with their franchise rights, for approximately $225,000 each. The Gorgeses, on the other hand, received not only $200,000 when they sold their cable television company to Desert cable, they received over $2,000,000 in franchise lease payments. This comparison of the worth of Coachella Valley franchises is at least somewhat relevant to the question of whether Desert Cable and the Gorgeses intended the lease payments to continue beyond the life of the franchise. See Cal.Civ.Code § 1647 (1993) ("A contract may be explained by reference to the circumstances under which it was made,...."); Kraemer v. Kraemer, 334 P.2d 675, 683 (Cal.Dist.Ct.App.1959). Accordingly, we cannot conclude that the district court abused its discretion by admitting this evidence.
 
 
 22
 The district court excluded the evidence of the Gorgeses' prior suit over lease payments because the evidence was irrelevant, confusing, and prejudicial. The prior litigation involved a dispute over the geographic area for which Palmer had to pay lease payments. Because this suit was unrelated to the meaning of "renewal" under the lease agreement, we conclude that the district court's exclusion was not an abuse of discretion.
 
 
 23
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3